UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DANIEL ANTHONY PEACE,

                Plaintiff,

    v.                                       Case No. 15-cv-481-pp

WILLIAM J. POLLARD, *et al.,*

                Defendants.

## DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 52), GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 64) AND DISMISSING CASE

The plaintiff, who is representing himself, filed this lawsuit under 42 U.S.C. §1983, alleging that the defendants violated his constitutional rights when they were deliberately indifferent to his serious medical needs. Dkt. No. 1. Specifically, he is suing Sergeants Bradley Tanner and Bonnie Lind because they allegedly denied him medical ice in December 2014. He also is suing Officers Lajuan Lewis and Alyssa Eake, Captain James Olson and Security Director Tony Meli, because they alleged failed to intervene to stop Tanner and Lind from denying the plaintiff medical ice. Finally, he is suing Inmate Complaint Examiner Tonia Moon, Warden William Pollard, Policy Advisor Cindy O'Donnell and Corrections Complaint Examiner Welcome Rose, because they allegedly failed to investigate his inmate complaints.

1

On September 21, 2016, the plaintiff filed a motion for partial summary judgment. Dkt. No. 52. A month later, the defendants filed a motion for summary judgment. Dkt. No. 64. The motions are fully briefed. The court denies the plaintiff's motion, grants the defendants' motion and dismisses the case.

## I. RELEVANT FACTS[1]

### A. Parties

The plaintiff currently is an inmate at Redgranite Correctional Institution. Dkt. No. 95 at ¶1. During the period relevant to this case, he was incarcerated at Waupun Correctional Institution. Id.

All of the defendants are employed by the Wisconsin Department of Corrections. Id. at ¶2-11. At the relevant time, the following defendants worked at Waupun in the following capacities: Tanner and Lind were correctional sergeants, Eake and Lewis were correctional officers, Meli was the Security Director, Olson was a captain, Moon was an inmate complaint examiner (ICE),

---

[1] The court takes the relevant facts from Defendants' Replies to Plaintiff's Responses to Defendants' Proposed Findings of Fact (Dkt. No. 95) and Defendants' Response to Plaintiff's Proposed Findings of Fact (Dkt. No. 79). As highlighted by the defendants, the plaintiff attempted to incorporate by reference additional proposed findings of fact (Dkt. Nos. 32, 39 and 45), which he previously had filed in support of two motions for preliminary injunction (Dkt. Nos. 30, 31, 38 and 44). The court will not allow the plaintiff to incorporate by reference the proposed findings of fact that he previously filed for another purpose; if it allowed him to do that, his total number of proposed findings of fact would greatly exceed the limit set by Civil L.R. 56 (E.D. Wis.).

and Pollard was the warden. Id. at ¶2-9. Rose, who was a corrections complaint examiner, and O'Donnell, who was a policy advisor, worked for the DOC at its main office in Madison (not at Waupun). Id. at ¶10-11.

B.     The Plaintiff's Injury and Prescribed Treatment

On November 12, 2014, inmate Carl Grant ran over the plaintiff's left foot (specifically, his little toe) with a metal garbage cart. Id. at ¶12. Nurse Schaefer (who is not a defendant) examined the plaintiff's foot and gave him Tylenol for the pain. Id. at ¶13-14. Two days later, Nurse Schaeffer examined the plaintiff again. Id. at ¶15. She noted that the plaintiff's little toe was bruised, but not fractured. Id. at ¶16. Nurse Schaeffer recommended Tylenol for the pain, and she gave him some ice. Id. at ¶17.

A little more than a week later, the plaintiff had a follow-up appointment with Nurse Rudak (who is not a defendant). Id. at ¶19. At that time, the plaintiff still had pain in the left little toe, but also was having pain in his left big toe when he walked. Id. at ¶20. Nurse Rudak opined that the pain in the plaintiff's left big toe likely was because of a bunion, and noted that his little toe "had good circulation, motion, sensation and movement." Id. at ¶21. X-rays confirmed that the plaintiff's foot was not fractured. Id. at ¶22. Nurse Rudak prescribed the plaintiff an anti-fungal and recommended that for the next six weeks, he soak his left foot in Epsom salt for in the evenings, and ice in the morning. Id. at ¶23. She also "filled out a 'Special Needs' request form, which stated that [the plaintiff] should use a hot/cold bag four times per day, which

included 'Hot soak in PM,' 'ice in the AM and afternoon and hot/warm in evenings or after work.'" <u>Id.</u> at ¶24. Her order was in effect from November 24, 2014 through January 1, 2015. <u>Id.</u>

C.    <u>Medical Ice Procedures at Waupun</u>

Typically, inmates receive medical ice at medication pass times: "morning at approximately 6:00 a.m. to 7:30 a.m.; noon (12:00 p.m.), night at approximately 3:30 p.m. to 5:00 p.m., and/or bedtime around 8:00 p.m." to 9:00 p.m., depending on unit activities. <u>Id.</u> at ¶26. Inmates may get their own medical ice "during dinner time hours because they are already out of their cells." <u>Id.</u> at ¶28. Unless an inmate has a medical restriction that specifically states different times, these are the times medical ice is distributed. <u>Id.</u> at ¶26.

After dinner is over, inmates can obtain medical ice in two ways. <u>Id.</u> at ¶29. They can ask their "inmate tier tenders"—"other inmate workers that are responsible for various tasks such as delivering ice (medical and non-medical), distributing and collecting meal trays and supplies such as toilet paper, etc." <u>Id.</u> "Tier tenders make an announcement on the unit that they are going to hand out ice, in order to notify inmates to get their ice bags ready if they would like to receive medical ice." <u>Id.</u> at ¶32. It then is the inmates' responsibility to put their ice bags through the hole in their cell doors, so the tier tenders can fill them with ice. <u>Id.</u> Tier tenders pass out ice just before 8:00 p.m., because all inmates are locked in their cells for the night at 8:00 p.m. <u>Id.</u> at ¶33. The plaintiff asserts that he did not know he could get ice from a tier tender until

Lind told him so on December 14, 2014, and that no tier tender ever made an announcement that he was about to hand out ice. Id. at ¶29-33.

The second way inmates may get ice after dinnertime is by asking "the officer working on the unit to have the on duty sergeant allow [the inmate] out of [his] cell to get [his] medical ice." Id. at ¶34. The defendants indicate that this is not the preferred approach because some evenings are very busy, and it is not always possible to allow an inmate out of cell for the sole purpose of getting ice. Id. at ¶35-36. The decision on whether to let an inmate out of his cell to get medical ice is left to the discretion of the sergeant, and depends on the activities going on in the unit and whether there is staff available to accommodate the inmate's request. Id. at ¶37.

D. The Plaintiff's Medical Ice in November and December 2014

The plaintiff concedes that, from November 24, 2014 through December 1, 2014, he was allowed to get medical ice once or twice per day, at dinner time and/or during the medication pass time at about 8:00 p.m. Id. at ¶40. During that time, Tanner was one of the sergeants working on the plaintiff's unit, and he allowed the plaintiff to "receive his medical ice." Id. at ¶41.

On December 2, 2014, the plaintiff got back to his cell around 7:00 p.m. and discovered that his toilet wasn't working. Id. at ¶42. The plaintiff notified Lewis. Id. at ¶44. Lewis told the plaintiff that he would reset the toilet, then went on about his regular duties. Id. About thirty minutes passed; at around

7:30 p.m., the plaintiff began to yell out of his cell. <u>Id.</u> at ¶45. Eake responded, told the plaintiff to stop yelling and reset the plaintiff's toilet. <u>Id.</u> at ¶45-46.

At about 8:00 p.m., Eake was passing out medication to the plaintiff, when the plaintiff told Eake he that he "needed to be let out of cell to get his medical ice." <u>Id.</u> at ¶47. Tanner was the regular sergeant on the unit; he decided whether to allow inmates to get ice after 8:00 p.m., based on staff work load and availability. <u>Id.</u> at ¶48. On that night, no one returned to let the plaintiff out of his cell. <u>Id.</u> at ¶50. The defendants do not know why no one came back; they speculate that no staff was available, or that whatever was going on in the unit prevented Tanner from coming to let the plaintiff out, or that Tanner simply forgot about the plaintiff's request. <u>Id.</u> The plaintiff asserts that Tanner did not let him out that night because the plaintiff had been yelling out of his cell earlier. <u>Id.</u> at ¶51. (The plaintiff did not get a conduct report for yelling out of the cell. <u>Id.</u> at ¶52.)

The next night, on December 3, 2014, "Tanner gave [the plaintiff] permission get ice after dinner." <u>Id.</u> at ¶53. The plaintiff "also asked Tanner at that time to let him out of his cell after 8:00 p.m. to get ice." <u>Id.</u> at ¶54. The plaintiff "iced his foot after dinner" that night. <u>Id.</u> at ¶55. But no one showed up to let the plaintiff out to get ice a second time. <u>Id.</u> at ¶56. Again, the defendants do not know why; they speculate that either Tanner was busy with unit activity, or forgot. <u>Id.</u> at ¶56. The plaintiff asserts that he was "told" that he wasn't let out because he had been yelling out of his cell the day before. <u>Id.</u>

The plaintiff did get his medical ice the next day (December 4); at that time, he told Tanner that, while his restrictions allowed him to ice four times per day, he had found that icing worked best if done at night. Id. at ¶¶58-59. From December 4 through December 13, 2014, the sergeants on duty, including Tanner, let the plaintiff out of his cell after 8:00 p.m. to get ice. Id. at ¶60.

On December 14, 2014, during medication pass, the plaintiff "notified the officer working the range that he needed to be let out to get his medical ice." Id. at ¶62. Lind was the sergeant on duty that night, and she went to the plaintiff's cell. Id. at ¶63. Lind had looked at the plaintiff's ice restriction, and had seen that it prescribed ice in the morning, but not for the evening. Id. at ¶64. She told the plaintiff that she didn't understand the restriction sheet. Id. Lind denied the plaintiff's request to be let out of his cell to get ice. Id. at ¶69.

Lind explains that it was her usual practice to deny inmate requests to get medical ice after 8:00 p.m. lockdown, but says that she would make an exception if the inmate had a legitimate reason for not getting ice prior to lockdown. Id. at ¶65. Lind believes that allowing inmates out of their cells after lockdown encourages inmates to disregard unit procedures and uses up staff resources by taking officers away from their assigned duties. Id. at ¶66-67.

The plaintiff received medical ice when he wanted it from December 14, 2014 through January 1, 2015 (the duration of his medical ice prescription).

Id. at ¶71. The plaintiff was feeling better by January 1, 2015, so he did not use ice for the entire time that it was prescribed. Id. at ¶72.

A. <u>The Plaintiff's Notice to Meli, Olson, Eake and Lewis</u>

On December 7, 2014, the plaintiff sent Meli (the security director) an interview request complaining that Tanner had disrespected the plaintiff. Id. at ¶73-74. The interview request did not mention that Tanner had denied the plaintiff medical ice. Id. at ¶74. Meli responded to the plaintiff's interview request the next day. Id. at ¶73.

On December 8, 2014, the plaintiff sent an interview request to Olson informing him that Tanner had disrespected him. Id. at ¶75. The request did not mention that Tanner had denied the plaintiff medical ice. Id. On December 29, 2014, the plaintiff sent Olson a second interview request, complaining that Lind had denied him medical ice about two weeks earlier. Id. The plaintiff asserts that Olson did not respond to either request. Id.

Eake and Lewis assert that the plaintiff never told them that he was being denied medical ice. Id. at ¶76-77. They indicate that neither one of them were "capable" of opening the door to the plaintiff's cell, to let him out to get ice. Id. at ¶78. The plaintiff responds that either Eake or Lewis could have popped open the trap door through which they passed out medication, he could have given them his ice bag and they could have brought him ice, but that they refused. Id.

E.      The Plaintiff's Inmate Complaints

Under the Wisconsin Inmate Complaint Review System, an inmate must file an inmate complaint within fourteen days after the occurrence that gives rise to the complaint. Id. at ¶80. The inmate complaint examiner reviews the complaint and then rejects it or recommends action to the warden, who will dismiss or affirm the complaint. Id. at ¶81. If an inmate disagrees with the warden's decision, he can timely file an appeal with the Corrections Complaint Examiner. Id. at ¶83. This process—from filing an inmate complaint through the appeal—constitutes the administrative remedies available to inmates. An inmate must exhaust those administrative remedies before he can file a civil action against any officer, employee or agent of the department. Id. at ¶82.

On December 7, 2014, the plaintiff submitted an inmate complaint, asserting that Tanner had disrespected him by calling him an inappropriate name and using disrespectful language. Id. at ¶84. The ICE office received the complaint the next day. Id. at ¶85. Moon, the inmate complaint examiner, sent the plaintiff  a letter, telling him that before ICE could accept the complaint, he first needed to try to resolve his issue by contacting Olson, the supervisor of the plaintiff's cell hall. Id. at ¶91-92. The plaintiff resubmitted his inmate complaint on January 2, 2015; at that time, ICE gave it a file number. Id. at ¶95. The plaintiff did not provide any proof that he'd tried to work things out with Olson. Id. at ¶96. Moon spoke to Tanner about the plaintiff's complaint that he had disrespected him; Tanner denied swearing at the plaintiff. Id. at

¶97. Moon noted that it was the plaintiff's word against Tanner's; because there was no other credible evidence to support the plaintiff's allegations, she recommended the complaint be dismissed. Id. at ¶98. Pollard dismissed the complaint on February 19, 2015. Id. at ¶99.

The next day, the plaintiff appealed Pollard's decision. Id. at ¶100. In his appeal, the plaintiff again complained that Tanner had disrespected him. Id. at ¶101. He also complained that Tanner had failed to let him out of his cell to get medical ice because the plaintiff had been yelling out of his cell. Id.

Rose reviewed the appeal and noted that the plaintiff had presented no information to warrant a recommendation overturning Pollard's decision; she recommended that the appeal be dismissed. Id. at ¶102. Rose also noted that on appeal, the plaintiff had presented new issues (not presented in the original complaint) relating to "unit staff not adhering to his medical order for ice." Id. at ¶103. Because an inmate may not raise an issue for the first time in an appeal, Rose indicated that she was not making a determination on the issue of staff adhering to his medical order for ice, but was limiting her review to the issue of Tanner allegedly swearing at the plaintiff. Id. at ¶104-105.

O'Donnell reviewed and agreed with Rose's recommendation; she dismissed the appeal on April 6, 2015. Id. at ¶107.

On December 25, 2014, the plaintiff submitted a second offender complaint. Id. at ¶108. He complained that Lind (he spells her name Lien in the inmate complaint) refused to let him out of his cell to get medical ice despite

him showing her his medical restriction sheet. Id. at ¶108. Four days later, Moon informed the plaintiff that he needed to try to informally resolve the issue through Olson before she could accept his complaint. Id. at ¶109-111.

A couple of weeks later, the plaintiff resubmitted his offender complaint, and ICE gave it a file number. Id. at ¶112. Again, he did not provide any proof that he'd tried to resolve the issue through Olson. Id. at ¶113. Moon investigated the plaintiff's allegations by contacting his cell hall. Id. at ¶114. Moon states that she learned that tier tenders hand out ice on their rounds and that inmates are not let out of their cells just to get ice. Id. Moon concluded that the plaintiff could have gotten ice from the tier tenders as Lind instructed him, so she recommended that his offender complaint be dismissed. Id. at ¶114-115. Pollard accepted Moon's recommendation and dismissed the offender complaint on March 2, 2015. Id. at ¶116. The plaintiff appealed the decision. Id. at ¶117. Rose determined that the plaintiff should have followed the unit practice/procedure of asking the tier tenders for ice. Id. at ¶119. She recommended dismissal; O'Donnell accepted Rose's recommendation and dismissed the appeal on April 14, 2015. Id. at ¶¶119-120.

## II.  DISCUSSION

### A.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B. Exhaustion of Administrative Remedies

In their motion for summary judgment, the defendants urge the court to grant summary judgment in their favor on the plaintiff's claims that Tanner was deliberately indifference when he failed to give the plaintiff medical ice on

December 2 and 3, 2014, because the plaintiff did not exhaust his administrative remedies on that claim. Dkt. No. 65 at 16-18. The court agrees.

According to the Prison Litigation Reform Act (PLRA), "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a). Various important policy goals give rise to the rule requiring administrative exhaustion, including restricting frivolous claims, giving prison officials the opportunity to address situations internally, giving the parties the opportunity to develop the factual record and reducing the scope of litigation. Smith v. Zachary, 255 F.3d 446, 450-51 (7th Cir. 2001).

Wisconsin has established the Inmate Complaint Review System (ICRS) as the principle administrative remedy for those in state custody. Inmates are required to file an offender complaint within fourteen days after the incident that gives rise to the complaint. Wis. Admin. Code § DOC 310.09. Each inmate complaint must contain only one issue, and the inmate complaint must clearly identify the issue. Id. at §310.09(e).

After investigating, the inmate complaint examiner (ICE) makes a recommendation to the reviewing authority (here, the warden) to either affirm or dismiss the complaint. Id. at § 310.11, 310.12. If the prisoner is dissatisfied with the reviewing authority's decision, he can appeal it to the Corrections Complaint Examiner within ten days, and the Corrections Complaint Examiner

then recommends a decision to the Department of Corrections Secretary. <u>Id</u>. at § 310.13(1), (7), 310.14(2).

If a court determines that an inmate failed to complete any step in the exhaustion process prior to filing a lawsuit, the court must dismiss the plaintiff's complaint. <u>Perez v. Wis. Dept. of Corrs.</u>, 182 F.3d 532, 535 (7th Cir. 1999) ("[A] suit filed by a prisoner before administrative remedies have been exhausted must be dismissed; the district court lacks discretion to resolve the claim on the merits.").

The plaintiff admits that he did not file an inmate complaint regarding Tanner's failure to give him medical ice on December 2 and 3, 2014. His complaint stated only that, while he was getting ice, Tanner "used very disrespectful language" towards him. Dkt. No. 95 at ¶84. The plaintiff *did* raise Tanner's alleged refusal to let him out of his cell to get ice in his appeal of Pollard's decision to dismiss the inmate complaint (Dkt. Nos. 1-1 at 21, 10); Rose informed the plaintiff, however, that that the issue was not properly before her because the plaintiff had failed to raise it in his original complaint.

A prisoner must complete *each step* in the exhaustion process before a court may address the merits of the underlying claim. The court finds that the plaintiff failed to complete the first step in the exhaustion process: he did not file an inmate complaint alleging that Tanner failed to provide him with medical ice. Because the plaintiff did not complete the first step in the exhaustion process prior to filing his lawsuit, the court cannot resolve that claim on its

14

merits. The court will dismiss without prejudice all of the plaintiff's claims related to Tanner's alleged refusal to give the plaintiff medical ice on December 2 and 3, 2014.

      C.    <u>Deliberate Indifference</u>

The defendants ask the court to grant summary judgment in their favor on the plaintiff's Eighth Amendment deliberate indifference to serious medical needs claims.

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when their conduct demonstrates 'deliberate indifference to serious medical needs of prisoners.'" <u>Gutierrez v. Peters</u>, 111 F.3d 1364, 1369 (7th Cir. 1997) (citations omitted). This standard contains both an objective element—that the medical needs be sufficiently serious—and a subjective element—that the officials act with a sufficiently culpable state of mind. <u>Id.</u> To survive summary judgment, the plaintiff must provide sufficient evidence that a jury could reasonably conclude that he has proven each element of the standard.

With regard to the objective element of the standard, the Seventh Circuit has held that not "every ache and pain or medically recognized condition involving some discomfort can support an Eighth Amendment claim." <u>Gutierrez v. Peters</u>, 111 F.3d 1364, 1372 (7th Cir. 1997). "For example, a prison medical staff's refusal to 'dispense bromides for the sniffles *or minor aches and pains* or a tiny scratch or a mild headache or minor fatigue . . . does not violate the

15

Constitution." <u>Reed v. McBride</u>, 178 F.3d 849, 852-53 (7th Cir. 1999) (citations omitted) (emphasis added). Medical conditions must be "sufficiently serious or painful to make the refusal of assistance uncivilized." <u>Cooper v. Casey</u>, 97 F.3d 914, 916 (7th Cir. 1996).

Another inmate ran over the plaintiff's foot with a garbage cart. As a result, the plaintiff's foot was swollen, and he had some bruising around his little toe. The nurses who assessed his foot injury concluded that his toe wasn't fractured, and that he had only swelling and bruising. Their assessments were confirmed by an x-ray. Although the plaintiff states that his big toe also hurt, the record indicates that that pain was not the result of his confrontation with the garbage cart; it was the result of a bunion. Dkt. No. 95 at ¶21. The plaintiff also spends much time describing the pain he suffered from a pre-existing foot condition that required orthotics and specialized boots, dkt. no. 84 at 2-3, but the prescription for medical ice had nothing to do with those conditions. The nurse prescribed medical ice to address the injury he suffered from his foot being run over by the garbage cart.

The court finds that no jury could reasonably conclude that a swollen foot and bruising to a pinky toe are an objectively serious medical condition implicating constitutional protection. This conclusion is supported by the evidence regarding the plaintiff's own behavior. Nurse Rudack recommended Tylenol, warm Epsom salt soaks at night, ice in the morning and afternoon and use of a hot bag in the evenings or after work. She recommended that the

plaintiff follow this treatment plan for five weeks. The plaintiff, however, did not use the ice twice a day every day, nor did he use it for the entire five weeks. Under these circumstances, neither the court nor any reasonable jury could conclude that the fact that he did not receive ice on two occasions after dinner in December 2014, and on one evening after dinner on December 13, 2014 caused him such pain that his treatment was "uncivilized."

Because the plaintiff did not suffer from an objectively serious medical condition, Lind did not violate the Eighth Amendment when she refused to allow the plaintiff to get medical ice on the evening of December 14, 2014. Because Lind's actions do not amount to a constitutional violation, the remaining defendants did not violate the Eighth Amendment when they allegedly failed to intervene and/or investigate her refusal to let the plaintiff out of his cell to get medical ice. The defendants are entitled to summary judgment on these claims.

Because the defendants are entitled to summary judgment, the court will dismiss the case. The plaintiff is not entitled to summary judgment for the same reasons that the defendants are so entitled.

## III.    CONCLUSION

The court **ORDERS** that the plaintiff's motion for partial summary judgment is **DENIED**. Dkt. No. 52.

The court **ORDERS** that the defendants' motion for summary judgment is **GRANTED.** Dkt. No. 64.

The court **DISMISSES without prejudice** the plaintiff's claims arising out of the denial of medical ice on December 2 and 3, 2014, because the plaintiff failed to exhaust his administrative remedies with regard to those claims.

The court **DISMISSES with prejudice** the plaintiff's claims arising out of the denial of medical ice on December 14, 2014.

The court **ORDERS** that the case is **DISMISSED**. The clerk of court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the

entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 29th day of January, 2018.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**